## Case No. 16,305a.

### UNITED STATES v. SIXTY-FIVE PACKAGES OF GLASS.

[Betts, Scr. Bk. 23.]

### District Court, S. D. New York. 1838.

CUSTOMS DUTIES—FORFEITURE OF GOODS FOR FALSE ENTRY—BURDEN OF PROOF—PRINCIPAL AND AGENT.

[1. In a proceeding to forfeit goods because of fraudulent undervaluation, the fact that they were invoiced and entered at only about one-half the invoice price of like goods purchased by other importers at the same time and imported by the same vessel, justifies the customs officials in making the seizure, and puts the burden on the claimants to substantiate the invoice by clear proofs, admissible under the ordinary rules of evidence.]

[2. Where an importer purchases goods through an agent in Europe, and the agent, though having a lien for advances, surrenders the goods to the importer for much less than the purchase price, because the latter is unable to pay more, the sum for which they are thus surrendered is not the proper invoice price, but the invoice should be at the original price at which the agent purchased the goods.]

[3. But, if the agent violated his authority in purchasing the goods, and thereby made them his own, the importer would have a right to purchase them from the agent as owner; and, if he obtained them at a reduced price, this would be the price at which they should be invoiced and entered, although much below the prevailing price of like goods.]

This was a suit for the forfeiture of 65 packages of glass, imported by the claimants in October, 1838, and alleged to have been entered at the custom house below their cost, in order to defraud the revenue.

In opening the case to the jury, the district attorney, Mr. Butler, said: It is supposed by some of those persons who take it upon themselves to enlighten public courts and juries, that cases of this kind are to be regarded as mere controversies between the custom house and the importer, and that if the latter can prove he committed no fraud, and the jury find for him, it seems some persons think that the custom house officer is subject to reproach. This is inconsistent with the very first principles of public liberty. An act of congress has imposed certain duties and established various regulations for the protection not only of the manufacturer, but also of the honest merchant. And when these regulations are carried into effect, in good faith, by public officers, and that they, acting on their oaths, consider that goods have been entered far below the cost at which they could be imported, and far below the ordinary cost of articles of that description, in such case, the collector, as a faithful public officer, has no more right to let those goods pass, without a judicial procedure, than he would have to remit one-half the duty to any person he chose, at the expense of the government and the honest merchant. The goods were entered at 8,665 francs, and entered by the claimants as owners, in which case they

were bound to enter the goods at the price they cost where they were purchased. On being examined at the custom house, the articles appeared to have been entered so much below the ordinary price of such goods, so much lower than goods which were imported in the same vessel, that the collector seized them and had them appraised, and several dealers in the article appraised these goods at 16,753 francs, being nearly 100 per cent. more than the price at which they were entered. This was the case for the United States.

Mr. Cutting opened the case for the claimants, and said: ·The district attorney has made observations of rather a singular character for the opening of such a case as this, in relation to which I shall make one or two remarks. The learned gentleman wishes you to believe that a great deal of odium or reproach has been cast on the custom house officers, and that you ought not, by your verdict, make that odium greater than it is. I came not here to cast odium on any person, but I came here to protect the character of respectable men, and I ask you, gentlemen of the jury, if you are bound to protect the custom house officers, are you not at least equally bound to protect an honest merchant from the imputation of perjury? Whether odium exists in relation to the custom house, I will not say, but I will say that when the whole public once form an opinion, such opinion is generally correct, and, if odium does exist, I must necessarily come to the conclusion that there was good cause for it. Mr. Hoyt may rest assured that if he acts fairly and correctly he will be fully sustained by the public, but if he prosecutes merchants, locks up their goods, puts them to unnecessary cost, trouble, and inconvenience, and drags them before a court and jury, and does it too often, public odium will most certainly and deservedly attach to him.

Mr. Cutting then stated that, notwithstanding the goods had been invoiced and entered at a price so much below the ordinary cost of such goods, it was nevertheless the actual price which the claimants paid for them. And in order to account for the articles having been purchased so low, it was stated that in the spring of 1837 the claimants sent an order to the house of Allamand, Freres & Herseut, of Paris, with whom the claimants had considerable dealings, to procure the articles in question. and forward them to this city, and that Allamand & Co. so far acted on this order as to procure the articles from Launay, Hauton & Co., glass manufacturers at Paris, who agreed to execute the order for 14,238 francs. In consequence of the then commercial embarrassments in this city, and also a considerable debt being due them by Morlot & Co., Allamand & Co. did not forward the goods, and retained them in their own possession. In September, 1838, R. Morlot was in Paris to settle the affairs of his house

with Allamand & Co., who had the glass then in their possession, and who sold it to Morlot for 8,565 francs. Of the reduction thus made by Allamand & Co. from what the goods cost them they were allowed ten per cent. by the manufacturers, who deducted so much from the price, because they had not delivered the goods to Allamand & Co. in due time, and the remaining loss of 4 and 5,000 francs Allamand & Co. thought proper to submit ·to, in order not to have the goods lying on their hands, and therefore sold it to Morlot & Co. for 8,655 francs, being the price at which it was entered at this custom house.

In support of these allegations, the deposition of Allamand, taken at Paris, was read, and in this deposition he swore ·that his house sold Morlot the glass in question at the price at which it was entered at the custom house in New York, and that they did so as they had a large quantity of glass on hand. A deposition made by one of the firm of Launay & Co., the persons who manufactured the glass, was also read, which stated they were to have been paid 14,236 francs for the glass, but owing to peculiar circumstances they had taken 12,865 francs for it from Allamand & Co.

This was the case for the defendant. There was no evidence to show the exact time when Morlot & Co. ordered the glass from Allamand & Co., but the latter did not receive the glass now in question from the manufacturer until August, 1838, only a few weeks before they sold it to Morlot & Co.

BETTS. District Judge (charging jury). The issues upon the information are: (1) Whether the packages were made up with intent by a false valuation to evade and defraud the revenue, in this: that the goods, &c., cost the importer thereof a higher price than the prices set forth in the entry thereof at the custom house. (2) Whether the invoice was made up with intent, by a false valuation to evade and defraud the revenue, in this: that the goods, &c., were charged at a less price than they actually cost the importer thereof. (3) Whether the entry was made up with intent by a false valuation to evade and defraud the revenue, in this: that the goods were charged in the entry at a less price than they actually cost the importer.

The United States having given proof sufficient in the first instance to show that the invoice in this case was made up at a great undervaluation of the goods, and that undervaluation being so great as to well justify the jury in inferring that it was made with intent to evade the payment of duties which would have been chargeable on the market value, the claimants are put in a situation where they are required by the law to prove that they purchased the goods at the prices charged. The law subjects articles of this

description to an impost calculated upon their market value at the place where purchased; but the cost on a bona fide purchase is regarded as the true market value, and if the claimants establish by satisfactory evidence that the goods are invoiced at the actual purchase price, they will rescue them from seizure, however much such price paid may be below the current or standard value of the commodity in the foreign market. The reasonableness of the rule calling from the importer proofs to support his invoice is clearly illustrated by the evidence in this cause; for other goods of the same description purchased for cash by merchants here of the same house in Paris, and imported in the same vessel with those now under seizure, cost nearly 100 per cent. more than these are charged. The government, by permitting an invoice so circumstanced to pass unquestioned, would not merely accept of half less duties from one merchant than is exacted from another under precisely like circumstances, and thus give one an unreasonable advantage over the other in the home market, but would also promote endeavors in others to escape burdens which should be fair and equal to all. When claimants are put to proof on a charge like the present, the law gives this attitude to the case, that they are to substantiate the variety of the invoice by affirmed and clear proofs, admissible under the ordinary rules of evidence.

In this point of view, the affidavit of the claimants, attached to the entry, is of no avail and cannot be regarded as making evidence either directly or indirectly. It has no relevancy to the issue on trial, further than as a declaration of theirs which may be used as evidence against them, and was thus introduced by the United States to show that they imported and entered the goods as purchasers. The argument, that the jury must find that Mr. Morlot committed perjury, if they decide against his claim as purchaser of Allamand, is aside of the point on trial. The jury can have only regard to and weigh the legal evidence the claimants produce to support their claim, and their affidavit can have no more influence in considering this question than their mere assertions, without oath, could. It is not, therefore, in any sense, a question now to be investigated and decided, whether this oath is wilfully false or not.

The allegation on the part of the claimants is, that the goods were bought of the house of Allamand & Co., and the testimony of persons connected with the house is offered to establish the allegation. If there was nothing more in the case than the single transaction between the claimants and that house, of September 6th, upon which the goods were transferred to them, the jury would probably feel no hesitation in declaring it an actual purchase, and upon the terms stated; that is, if they give full credit to the testimony of Mr. Allamand. But proofs have been offered by the United States with a view to show that

the goods at the time were really the property of the claimants, and had become such on the antecedent purchase of them made by Allamand & Co. This branch of the case is the only one giving complexity or difficulty to the subject.

It is for the jury to ascertain the facts upon a careful survey of the whole testimony. The court is only to state the law as applicable to the facts. The proposition of facts advanced by the respective parties are these: The United States insist that Allamand & Co. made the purchase of these goods of Launay & Co. in the character of factors or agents of the claimants, and that the price paid by the factors was the actual cost at which the goods should have been invoiced. The claimants insist that Allamand & Co. did not pursue the authority given them in making the purchase, and that therefore the goods became their own property; that, Allamand & Co. holding the goods as their own, the claimants had a right to deal with them for the purchase, and that the sum actually paid on such transaction was the cost price to the claimants, at a bona fide purchase, and that such price was the sum stated in the invoice. If the jury find that Allamand & Co. acted within their authority in making the purchase in behalf of the claimants, then, as between them, that was the purchase of the claimants; the goods became theirs, and their factors could compel them to pay the price agreed. The property was theirs in law, but still the factors might have the right to detain the goods until their advances or liabilities in the purchase were discharged. Still, though subject to a lien in this behalf, the goods could be regarded in law as purchased by the claimants and their property. If the jury further find that the property being so situated, was delivered over to the claimants upon a composition of the debt, the factors to receive so much as the principals were able to pay, this new arrangement as to payment would not vary the relationship of the parties, in respect to the property; it would be no new sale, the actual price, in contemplation of the law, being that agreed to by the factors on the original purchase, although the sum they ultimately collected and consented to receive of their principals in discharge of the debt was greatly less. In such case the goods ought to have been invoiced at that purchase price, and putting them down at the composition sum would be a false valuation, which may subject them to forfeiture. If the jury find that Allamand & Co. did not pursue the authority given them by the claimants in making the purchase of Launay & Co. by an unreasonable delay or postponement of it or otherwise, or if it be found that upon any facts subsequently occurring, the house of Allamand & Co. made this property their own, and had no legal right to compel the claimants to receive it, then, in law, the claimants could deal with them for a purchase on the same footing as with any other strangers,

and buying of them under such circumstances may be regarded an original purchase. In such case, the sum paid by the claimants would be the actual cost price; the sum so paid must be distinctly priced by the clerk. Numerous facts and circumstances resulting from the testimony at large have been adduced by the counsel for the respective parties, conducing to support the one or the other of these propositions of fact, all of which are entitled to the careful consideration of the jury. These goods are subject to forfeiture if the purchase from Launay & Co. was the true cost price, in respect to the claimants (although in the end they actually paid much less for them), and the invoice was made up at the lower price with a view to the rate of duties which goods should pay here. They are entitled to acquittal, if the transaction of September 6th with Allamand & Co. was the original purchase of the goods. Allamand & Co. selling as absolute owners, and the claimants buying, as having a free election to take the goods or not, without respect to their ability to fulfil any legal obligations subsisting between them and Allamand & Co. in regard to the goods.